### BACKER et al. v. HOOK et al.

(Circuit Court of Appeals, Sixth Circuit. January 14, 1924.)

#### No. 3873.

1. Appeal and error ⚖══1009(1)—Presumption in favor of findings of chancellor, who heard witnesses.

Findings of fact by a chancellor, who saw and heard the witnesses, and was especially qualified to weigh their testimony by his knowledge of local conditions and customs, will not be overruled, unless clearly shown to be erroneous.

2. Adverse possession ⚖══85(4)—Possession of land of adjoining owner held not adverse, but in recognition of his ownership.

Possession by inclosure of a small parcel of land of an adjoining owner, though continued for many years, held, under the evidence, permissive and in recognition of the title of the legal owner.

Appeal from the District Court of the United States for the Eastern District of Kentucky; Andrew M. J. Cochran, Judge.

Suit in equity by George A. Hook and others against George E. Backer and others. Decree for complainants, and defendants appeal. Affirmed.

Edward C. O'Rear, of Frankfort. Ky. (Wm. L. Wallace and O'Rear, Fowler & Wallace, all of Frankfort, Ky., and Duncan & Bell, of Monticello, Ky., on the brief), for appellants.

A. C. Van Winkle, of Louisville, Ky. (Bertram & Bertram, of Monticello, Ky., and Garnett & Van Winkle, of Louisville, Ky., on the brief), for appellees.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DENISON, Circuit Judge. This case involves title to an oil lease in Wayne county, Ky., and the conflicting claims to the lease depend upon the respective underlying claims of title to the land. The parcel in dispute is a narrow strip lying north of the adjoining highway. In form it is approximately a segment of a circle, bounded on the northwesterly side by its chord, and opposite, along the highway, by the arc. The parcel is narrow, being only about 100 feet deep at its widest por-

tion, 1,200 feet long, and running out at each end. It contains about 1¼ acres. Backer and others, claiming under a Crabtree lease, drilled an oil well upon the parcel, and it proved to be a valuable well. Crabtree owned the surrounding premises on the north. Bertram owned the surrounding property on the south, and Hook and others, claiming this parcel under a Bertram lease, brought this action to establish that title, and asked an injunction and accounting. The trial court found that Hook had the better title, and made a decree for plaintiffs. The defendants, Backer and others, bring the case here by appeal. The parties will be named as below.

The matters involved can be better understood by reference to the following sketch map, made by combining parts of the maps of both parties:

Plaintiffs' title is founded upon a patent issued in 1854 to John Burris. Defendants challenged the location upon the ground of this patent so as to cover the parcel in dispute; but we are satisfied to adopt its location as fixed by the trial court and as shown upon this sketch by the lines A E F A (save that A E should swing on A slightly south, as hereafter explained). To reach this result, two matters must be determined: First, the location of the starting point; and, second, the location of the southerly and final line. The starting point was the "fifth Burris corner and John Denny's, two hickories," known as the hickory corner. It is not necessary to review the many considerations which persuade that the location of this corner, as shown by the map, is about as satisfactory as can be expected, under the circumstances common in these cases. The precise point is fixed at the intersection of two fairly located lines, as described by plaintiffs' surveyor. As to the final line: After the survey reaches the point marked F on the sketch, "being a stake at the corner of his old survey," the remaining

description is "thence south 80' west, with the line of said survey, 155 poles, to a stake; thence to the beginning." The more reasonable inference from this description, and from the surrounding surveys, is that, while the "old survey," then belonging to Burris (John Coffee, 1810), purported to be only 155 poles long upon its northerly side, yet in this Burris survey of 1854 it was found to overrun substantially, and for this reason the later surveyor made his reference to 155 poles, although intending the line to be continuous and direct from the point F 155 poles to point G and thence to the beginning.[1]

The chain of title from John Burris to plaintiffs is sufficiently established. Some suggested uncertainties as to description in the mesne conveyances are not substantial. It is said that the figure described by them will not coincide with any of the lines of the Burris patent. This is graphically shown in the brief; but these deeds follow existing fences to known corners. If for their calls for "north," "east," etc., we read "northerly," "easterly," etc., as we should, the difficulty disappears. From these conclusions, it is apparent that plaintiffs' prima facie paper title is sufficiently established.

Defendants first claimed title under the patent of James Coffee for 239 acres, issued in 1810, upon a survey made in 1804. Whether this patent covers the parcel in dispute is, to say the least, very uncertain. That depends upon the location of the beginning point and of two or three named lines, in the nature of monuments, and the location of each of them is not very fully established, at least, not so well as the hickory corner; but the original location of this Coffee patent, as to that portion which may have reached this immediate locality, is immaterial, because the defendants cannot claim title under it at this point. James Coffee sold the northerly portion of his patent to Hall, and that title passes out of view. The more southerly portion he conveyed to Strange, together with adjoining territory on the west. The boundary, as given on the Strange deed, is so peculiar as to be probably erroneous, but it may be conceded for the purpose of this question (defendants' title thereunder) that it includes the entire of the remaining southerly portion of the James Coffee patent, and includes that part of the parcel in dispute, which contains the well. The parcel deeded to Strange is said to contain 187 acres. Strange conveyed to Cox by a deed calling for 189 acres. It may be assumed that it covered the same premises deeded to Strange. Cox conveyed to Dean in 1827 by deed said to cover 150 acres. Before the boundary line in this deed reaches this vicinity, it departs wholly from the boundary line of the former deeds, and from its departure runs with a named, but undescribed, conditional line until it returns again to the old Coffee-Strange line at "three chestnuts," and then continues with the latter line to the beginning. There is no evidence showing what this conditional line was, or where it is.

[1] We do not overlook counsel's criticism of plaintiffs' map and location, because the line S A, called the Seminary line, and known to be N 55' E, has been at A wrongfully deflected 10' to the north, and yet it is still considered to be N 55' E. This criticism is based on a misapprehension. The line S A was put upon the map from a Denny-Burris deed, where, although it is called the Seminary line, it is described as N 65' E. For the surveyor to plot an angle of 10' at A was right.

The natural, if not necessary, inference is that this conditional line marked the southerly boundary, in this region, of the parcel conveyed to Dean, and that it serves to cut off and leave out the southerly portion of the James Coffee patent. There is no attempt to locate this conditional line south of, rather than north of, the parcel in dispute, and it follows that defendants' chain of title from James Coffee is fatally broken at this point. Indeed, the probability seems to be that this conditional line was the same line afterwards adopted by Burris as the northerly one of his survey, and later long recognized by the defendants' grantors as their southerly boundary. It follows that, as against plaintiffs' established paper title, defendants have shown no paper title whatever.

The question whether the parcel in dispute was covered by the James Coffee patent is said to be vital in another respect. If there was an interference between the James Coffee and the John Burris patent, the latter was, to the extent of the interference, invalid, at least, as against those claiming under the former. However, if the James Coffee patent is rightly located in this region at all, it extends away south of the highway [2] and, upon that portion of it, plaintiffs' grantors have had actual adverse possession, claiming under the Burris patent, ever since it issued. This would give them constructive possession also of the parcel north of the highway and perfect their title to the whole interference, except for the effect of such possession as defendants' grantors had north of the highway. This merely brings us to the character of this latter possession, which is the controlling feature of the case as later pointed out. If it was, in fact, adverse to plaintiffs' grantors claiming under the Burris patent, it makes a good title in defendants by actual adverse possession, without any regard to the Coffee patent; but if it was subordinate to Burris, and really Burris' possession, it fails in every respect in which it is urged, and obviously does not obstruct, but affirms, the Burris title to the entire Coffee-Burris interference by the adverse possession of the part thereof south of the highway, if there was any such interference.

[1] The remaining and controlling question is the one of actual adverse possession of this parcel. The inclosure next north of the line

---

[2] Putting the James Coffee patent, as plotted by defendants' Bell map, upon plaintiffs' map, by equalizing the scales and tying both to the ground at their only common point, the hickory corner, its southerly end follows the line a b c d, dividing the parcel in dispute practically at the well. The Bell map is not a safe dependence in forming any conclusions. The well and highway are admitted to be erroneously placed upon it. Its basis, in this region, is the easterly line of the Seminary grant (a e). Bell's starting northwest corner of this grant was put by vague recollection, somewhere in an open field. Following the northerly line the stated distance to "a black oak and two chestnuts," he was in another cleared field. Continuing somewhat further, he found an old chestnut stump, and made that the corner. If he had gone a bit further to some other stump, before turning, he would have put the line a b quite east of the well. Further, he ran the stated courses according to the magnetic compass in 1921, disregarding the change of 4' since 1810, whereby N 55' E has become N 59' E. Correcting this does not change the relative location of the different boundaries on the map, but does shift them all upon the ground, with relation to any known point, and destroys those coincidences upon which Bell largely relies.

B C was a large field, and undoubtedly has been in occupation and cultivation by the Denny-Crabtree families, with the degree of continuity customary in that region, since before the Burris patent, just as all the adjacent region south of the highway has been correspondingly since that time in the occupation of Burris and plaintiffs' grantors. The parcel in dispute at both its end portions is hilly, rocky, and agriculturally worthless. In its central part, and including the well, there is a patch of bottom land, not over a quarter of an acre, where the tillable land in the northerly field runs in a point south as far as the road. Since as early as 1865 or 1870 there has been a fence upon the north side of the highway, built and maintained by the Denny-Crabtree families, and there has been no fence upon the line B C. The result is · that the parcel in dispute has been inclosed with the Crabtree field, and in the actual and apparently adverse possession of defendants' grantors. The conclusion of the trial court, however, was that defendants' grantors neither had nor made any claim of title to this parcel, always conceded that it belonged to plaintiffs' grantors, and only inclosed it with their own field as a matter of convenience and in recognition and not in denial of the Burris-Bertram title. Obviously, if this conclusion is correct, it makes an end to defendants' claim; and it remains to consider whether the testimony to the contrary is so clear and satisfactory that we will be content to reverse the decision of the chancellor, who saw and heard the witnesses, and who was familiar with the somewhat peculiar local conditions and customs, and especially qualified to draw the right inference from the speech and conduct of the people. Under the familiar rule we should be thus satisfied or else affirm. In re Snodgrass (C. C. A. 6) 209 Fed. 325, 326, 126 C. C. A. 251; Carey v. Donahue (C. C. A. 6) 209 Fed. 328, 333, 126 C. C. A. 254.

[2] The importance of inclosure within a fence is minimized here as much as it ever may be. Permitting the road to be the boundary of the field allowed one fence to serve the purposes of two. Relieving the Burris-Bertram owners from any burden on account of fence maintenance would have been ample consideration for, and explanation of, permitting the Denny-Crabtree owners to cultivate the point of tillable land projecting over the true line. The circumstances show that there would be nothing unreasonable in such a mutual understanding as the chancellor found to exist.

Whether Denny and Crabtree actually claimed title to the parcel in dispute would be likely to depend upon whether they had color of title to it because it was included within the boundaries of the immediate conveyances to them, this being a separate question from the one whether there was a continuous paper title running back to James Coffee. The way in which any such claim of title naturally depends on such color of title is illustrated by the testimony of Mrs. Crabtree. After saying generally that her father, Denny, and her husband and herself, as successors to the title, always claimed south to the road fence, she says that she knows this because that is the way their deed reads, and that, of course, they would not have put the fence anywhere excepting on the deed line. The Crabtree title to the farm came through the will of Mrs. Crabtree's mother, Judea Denny, the wife of John

Denny, and daughter of William Perdue. It describes this land merely as bounded "on the south by John Bertram." The deed from William Perdue to his daughter, Mrs. Denny, is dated in 1856. It bounds the farm, commencing at the northwest, running east and south, and then comes, at a point fairly identified as N, "to the cross-fence between John Burris and John Denny, and with the fence to the mouth of the lane [M], and with John Denny's fence to said Burris hickory corner; thence with the big road to John Wynn's corner."

No doubt seems to exist that the "cross-fence" was upon the same line as the existing fence N M, shown on the map. The question is whether "John Denny's fence," of the next course, ran with the line C B, or with the highway C D B. That it was something other than a highway fence is indicated by the next course named, which expressly calls for the highway. It seems clear that John Burris and John Denny, in 1854, had been long-time neighbors and friends. Denny was occupying under his father-in-law, Perdue. Perdue's south line, by his title papers, was a now unknown "conditional line" somewhere along here. It would have been natural for Denny to build a fence along this conditional line. When Burris made his 1854 survey, he evidently regarded everything south of the line A C as vacant land. It would have been unnatural for him to start his survey across his neighbor's inclosed field. If the field then had been inclosed to the road, Burris would naturally have called for the road as his northerly boundary. The stated course running from the hickory corner practically strikes the point M, then and now on the agreed Denny southerly boundary. The slight divergence from that angle at that point, continuing easterly, might not have been noticed.[3] The evidence is clear that the present road fence has been repeatedly rebuilt, and each time moved southerly, though the witnesses who testified to this do not think it has been moved far enough to get its original location north of the well. There are clear evidences of an old fence running from the point B a considerable distance in a direct line toward C, and gradually increasing in distance from the road fence. As it comes down to the cultivated ground, these evidences disappear. There are somewhat similar evidences extending out from the point C toward B. We also find that as late as December, 1920, Mr. and Mrs. Crabtree undertook to convey certain interests in their land and carefully described their southerly boundary by courses and distances as being the line N M A (if we disregard, as we should, the very slight difference shown at M by plaintiffs' map—see note 3).

Putting all these things together, it is highly probable that the old conditional line and the "John Denny fence" of 1856 were practically upon the line B C, and that Denny and Crabtree never had any color

[3] According to the theory of plaintiffs' map, the divergence between lines A C E and A G T should be 25 degrees. As plotted, it seems to be 27. If this is corrected, by swinging the line A E 2' southerly, it will practically coincide with M, and this correction should be made. The course in the deed of December, 1920, called S 70' W, should be taken as intended for the fence N M, a variance of only 2'. It does not appear where or when this course (S 70' W) originated.

of title to the parcel in dispute. If this were otherwise in doubt, it would be confirmed by the clearly established fact that at some time, which cannot be fixed, save as about 1860, Burris and Denny fully understood that this parcel in dispute belonged to Burris, and agreed that he would exchange it for a parcel further west, and south of the highway, which belonged to Denny, but could be better inclosed by, Burris. It is a fair inference that it was in connection with, or in expectation of, such an understanding, that with the decay of the old fence on line B C, John Denny rebuilt it approximately upon the highway line. This might have been from 1860 to 1865. It follows that the Denny possession was either then first taken as, or was then expressly agreed and understood to be, a possession through and under the Burris title, and not in hostility to it. The strongest view that can be taken for Denny is that he was vendee under a contract of sale from Burris as vendor, the contract to be carried out by a deed whenever Denny made or tendered his deed for the parcel to be exchanged. Clearly the possession thus obtained or acknowledged was not adverse to Burris.

It is equally clear that it never could become adverse to Burris, unless there was an express disavowal of its character, and assertion of its hostile character; expressly or by clear implication brought to the notice of Burris or his successors in title. Far from showing this, the record shows that from time to time, down almost to the beginning of this suit, the respective successors in title, Crabtree and Bertram, were negotiating for the making of these exchange deeds, and fully acquiesced in the basis upon which the proposed exchange rested. The actual making of the deeds was escaped only by some very trifling disagreements. It is not clear how there is much room for doubt of the chancellor's conclusion that the possession of this parcel by Denny and Crabtree all these years has been not adverse, but permissive.

The strongest circumstance looking the other way is that the elder Bertram in recent years said he supposed that Crabtree had held the parcel so long that his title would be good. This is sufficiently explained by the chancellor's inference that such statement was made in ignorance of the legal rule, which requires effective possession to be in truth adverse. If it were defendants' theory that there had been, about 1860, an oral agreement by Burris to convey this parcel to Denny, followed by a change of possession, and if defendants had asked specific performance of such agreement, this theory would have required careful attention; but this theory is not presented by the pleadings, nor do we intend to intimate that it is sufficiently established by the proofs. The Kentucky legal rules regarding the matters discussed are too familiar to require elaboration.

In the opinion of a majority of the court, the decree of the District Court ought to be affirmed; and it is so ordered.